UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 17-252 (DSD/FLN) |
| Plaintiff, | |
| v. | |
| Lawrence Emmanuel Jackson, | **REPORT AND RECOMMENDATION** |
| Defendants. | |

Nathan Nelson, Assistant United States Attorney, for Plaintiff.
Lisa Lopez, Assistant Federal Defender, Lawrence Emmanuel Jackson.

___

**THIS MATTER** came before the undersigned United States Magistrate Judge on December 15, 2017, on Defendant Lawrence Emmanuel Jackson's motions to suppress (ECF Nos. 22 and 23). This matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. At the hearing, the Government offered testimony and entered exhibits into evidence. *See* ECF No. 43. For the reasons that follow, the Court recommends that Jackson's motions to suppress (ECF No. 22) be **DENIED** and Jackson's motion to suppress (ECF No. 23) be **GRANTED** in part, and **DENIED** in part.

## I. INDICTMENT

On September 27, 2017, a United States Grand Jury returned an indictment charging Lawrence Emmanuel Jackson with one count of false statement during the purchase of a firearm, in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2), and one count of unlawful user of a controlled substance in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(3) and 924(a)(2). ECF No.

1. The Indictment alleges that Jackson, in connection with the purchase of a firearm, knowingly made false and fictitious statement representing that he was the actual buyer of the firearm, when in fact he was purchasing the firearm on behalf of another person. *Id.* Further, that as an unlawful user of marijuana, he knowingly possessed firearm and ammunition. *Id*

## II. FACTUAL BACKGROUND

**A. October 14, 2016 Interview**

On October 14, 2016, Sergeant Steve Lorentz with the Brooklyn Park Police Department, and Agent Dave Voth with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), went to Jackson's home, in Andover, Minnesota, to question him about his firearm purchases. They arrived unannounced, in an unmarked vehicle, in plain clothes. Sgt. Lorentz testified that they wanted to question Jackson about a gun he had purchased two months prior, that officers had recovered during a high-speed pursuit. The officers waited for Jackson at the front door. Once Jackson arrived at the front door, officers identified themselves and told Jackson that they wanted to ask him a couple of questions about his gun purchases. Jackson agreed to talk to the officers, stepped outside, and closed the door behind him. The officers spoke to Jackson near the front door before he asked to step over to the driveway so that his mother would not hear the conversation. Jackson informed the officers that his guns were stolen, but agreed to allow the officers to see one of his guns that was still in his possession. Jackson led the officers to the basement of the residence, and showed them his gun. The officers took down the serial number of the gun and left the house. Jackson was not told that he was free to leave, or that he was not under arrest during their interaction.

**B. April 25, 2017 Interview**

On April 25, 2017, officers executed a search warrant at Jackson's home. Jackson was handcuffed, placed in a police car, and driven to the Minneapolis Police Department. ATF Agent Laura Gulick and Sergeant Marcus Benner of the Minneapolis Police Department interviewed Jackson at the police station. ECF No. 43, Ex. 5. Sgt. Benner read Jackson his *Miranda* rights and asked Jackson if he wanted to talk to the officers. *Id*. After which, the following exchange took place:

> Jackson: Ah, well, if I could get the lawyer, it would be cool because I'm not familiar with, you know the whole process and all that so I'd just rather be...I mean, is there a way I could, cause I could afford one, but I just got to get prepared. Is there a way we could reschedule to talk and come in, I mean I'm not …
>
> Sgt. Benner: Well I'm gonna book you into jail and then they will help you out with getting a lawyer.
>
> Jackson. Okay.
>
> Sgt. Benner: If that's how you want to do it.
>
> Jackson: Yeah...I mean....So what am I going to be booked for?
>
> Sgt. Benner: For assault with a deadly weapon
>
> Jackson: no assault...no weapon, no deadly weapon...
>
> Sgt. Benner: We have plenty of evidence that says your guns were involved in an assault. I have no doubt of it. I'm just trying to figure out who pulled the trigger. You seem like a nice man, I don't know [inaudible] but again if you'd like a lawyer the questioning has to stop here...and the conversation has to stop here.
>
> Jackson: I mean, I don't want to be sitting in no holding cell, I got work to do. And then are they gonna give me a bond and all that stuff?
>
> Sgt. Benner: I'm not sure what happens.
>
> Jackson: Okay.
>
> Sgt. Benner: Want to sit here and think about it for a second?
>
> Jackson: Well, no--it's just I don't want to waste no time here, that's all. But then again, like I said, this is not familiar to me and I don't want to..you know?
>
> Agent Gulick: That's a decision you have to make...
>
> Jackson: Right

3

>Agent Gulick: ...we can't give you advice one way or the other.
>
>Jackson: I know. yeah, I'm just trying to--think here. Let's just go on with it because I don't got shit to hide.
>
>Sgt. Benner: Go on with the interview?
>
>Jackson: Yeah, and then if at some point I don't feel comfortable…?
>
>Sgt. Benner: At any point, yeah. So to be clear right now, you're waiving your right to a lawyer and at any time during this questioning you can ask for a lawyer and stop.
>
>Jackson: Yes. Yes.
>
>Sgt. Benner: Okay. I just don't want to make it seem like I'm forcing you into anything.
>
>Jackson: No, no, yeah, I understand man. I'm fully aware of what's going on.

*Id.*

Following the above exchange, Jackson informed officers that a bag containing his firearms was stolen out of a vehicle, outside of his house, while he was on vacation in September of 2016. *Id.* Sgt. Benner then informed Jackson, that during his investigation, he had uncovered a victim who was shot with one of Jackson's firearms in August of 2016, during the time frame the gun was supposedly in Jackson's possession. *Id.* When Jackson adamantly denied his involvement in that shooting, Sgt. Benner asked Jackson if he would give him the passcode to his cell phone to prove that Jackson was not in the area of the shooting. *Id.* Jackson initially refused, saying that he did not want to give the officers the passcode unless he had an opportunity to look through the phone first, but eventually provided officers with his passcode. *Id.* Jackson eventually booked and charged with second-degree assault.

### III. CONCLUSIONS OF LAW

**A**. **Motion to Suppress Statements, Admissions and Answers (ECF No. 23)**

Jackson moves to suppress all statements, admissions and answers made by Jackson during his interview with law enforcement on October 14, 2016, and April 25, 2017, as well as all evidence

4

obtain as a result of those statements. Specifically, Jackson argues that his October 14, 2016, statements were made during a custodial interrogation where officers failed to administer *Miranda*. ECF No. 36 at 7–36. With regard to his April 25, 2017, statements, Jackson argues that officers interrogated him after Jackson invoked his right to counsel, and without a valid waiver from Jackson. *Id.* at 9–13. The Government responds that with regard to Jackson's October 14, 2016, statements, Jackson was not in custody at the time of the interview and, as such, the officers did not need to advice him of his *Miranda* rights. ECF No. 39 at 6–10. With regard to the April 25, 2017, statements, the Government contends that Jackson did not unequivocally invoke his right to counsel. *Id.* at 11–13. Further, that even if the Court were to find that Jackson unequivocally invoked his right to counsel, that officers did not subject Jackson to an interrogation following his invocation, and that it was Jackson who initiated the subsequent discussion with the officers. *Id.* at 13–17. Additionally, that even if the Court were to suppress Jackson's statements from his April 25, 2017, interview, that the evidence obtained as a result of those statements would still be admissible. *Id.* at 17.

### 1. October 14, 2016 Interview

The Fifth Amendment ensures that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "The basic rule of *Miranda* is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning." *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). In other words, law enforcement officers must inform suspects of their *Miranda* rights before subjecting them to "custodial interrogations." *Id.* The term "interrogation" under *Miranda* "refers not only to express questioning, but also to any words or actions on the part of the police (other than

5

those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."*Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Additionally,"[a]n individual is in custody [under *Miranda*] when placed under formal arrest, or when his or her freedom is restricted to a degree akin to formal arrest."*United States v. Elzahabi*, 557 F.3d 879, 883 (8th Cir. 2009) (citing *United States v. Ollie*, 442 F.3d 1135, 1137 (8th Cir. 2006)).

In the present case, it is undisputed that Jackson was not apprised of his *Miranda* rights during his October 14, 2016, interview. Therefore, the question before this Court is whether Jackson was in 'custody' during his October 14, 2016, interview. Whether Jackson was in custody during the interview turns on whether, under the totality of the circumstances, "a reasonable person in [Jackson's] position would have felt free to end the interrogation and leave." *Elzahabi*, 557 F.3d at 883. The Eighth Circuit has invoked a nonexclusive, six-factor test to guide a court in making a custodial determination:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;
> (2) whether the suspect possessed unrestrained freedom of movement during questioning;
> (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;
> (4) whether strong arm tactics or deceptive stratagems were employed during questioning;
> (5) whether the atmosphere of the questioning was police dominated; or
> (6) whether the suspect was placed under arrest at the termination of the questioning.

*Griffin*, 922 F.2d at 1349. However, "custody cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly . . . the ultimate inquiry

must always be whether the defendant was restrained as though he were under formal arrest." *United States v. Czichray*, 378 F.3d 822, 827-28 (8th Cir. 2004).

Based on the totality of the circumstances, the Court concludes that Jackson was not in custody during the October 14, 2016, interview. Testimony at the December 15, 2017, hearing, established that the interview was voluntary, Jackson was not handcuffed, his freedom of movement was not restraint, the interview took place at Jackson's home, and Jackson was not placed under arrest at the conclusion of the interview. The circumstances that may suggest that Jackson was in custody — the fact that that he was not informed that the questioning was voluntary or that he was free to leave and was not under arrest— do not establish that a reasonable person in Jackson's position would not have felt free to terminated the interview at any time. Accordingly, the Court finds that Jackson's motion to suppress should be denied with respect to his October 14, 2016, statements, admission, and answers.

**2. April 25, 2017 Interview**

In *Miranda v. Arizona*, the Supreme Court held that "a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins." *Davis v. United States*, 512 U.S. 452, 457 (1994) (citing *Miranda*, 384 U.S. at 469–73). That "if a suspect requests counsel at anytime during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Id*. at 458 (citing *Edwards v. Arizona*, 451 U.S. 477, 483 (1981)). "This 'second layer of prophylaxis for the *Miranda* right to counsel' is 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Davis*, 512 U.S. at 458 (citations omitted). "But if a suspect

makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.*

In the present case, there is no dispute that Jackson's April 25, 2017, statements were obtained as a result of a custodial interrogation, and that Jackson was fully apprised of his *Miranda* rights. The parties, however, disagree on whether Jackson unequivocally invoked his right to counsel, and whether it was Jackson, or Sgt. Benner, who initiated conversation after the invocation. *See generally*, ECF Nos. 36 and 39.

The Court's initial inquiry is whether Jackson invoked his right to counsel. After Sgt. Benner informed Jackson of his right to counsel, he asked if Jackson wished to speak with the officers, and Jackson replied "If I could get the lawyer, it would be cool, because I'm not familiar with the whole process and all that so I'd just rather be. . . I mean is there a way I could, because I could afford one, but I just gotta get that prepared." ECF No. 43, Ex. 5.

"Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis*, 512 U.S. at 458 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). "Although, a suspect need not 'speak with the discrimination of an Oxford don,' he must articulate his desire to have counsel present sufficiently clear that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459. Here, Jackson's request for counsel was unequivocal. After hearing his right to have an attorney present during the interview, Jackson asks Sgt. Benner if he "could get the lawyer," clearly indicating his present desire to obtain counsel. Jackson also asked if he could reschedule the interview. Demonstrating further, his desire to speak

8

with the officers only after consulting an attorney. A reasonable officer in light of the circumstances would have understood that Jackson was invoking his right to counsel. Indeed the record is clear that Sgt. Benner fully understood that Defendant had invoked his right to counsel. Immediately after Jackson's invocation Sgt Benner said, "Well I'm going to book you into jail and then they will help you out with getting a lawyer." Seconds later, Sgt Benner elaborates, "if you'd like a lawyer, the questioning has to stop here and the conversation has to stop here." ECF No. 39 at 5. Sgt Benner well understood Defendant had unequivocally requested counsel.

While the law required that the interview be terminated as soon as Defendant requested a lawyer, it was not. Further conversation ensued.[1] Having determined that Jackson invoked his right to counsel, the remaining question is whether Sgt. Benner, or Defendant Jackson, initiated the further conversation. Once an accused has invoked his right to counsel, police cannot subject him to further interrogation "unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 485. Put differently, "before a suspect in custody can be subjected to further interrogation after he requests an attorney there must be a showing that the 'suspect himself initiates dialogue with the authorities.'" *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983) (citing *Wyrick v. Fields*, 459 U.S. 42, 46–47 (1982)). "Such inquires or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which the word was used in *Edwards*." *Bradshaw*, 462 U.S. at 1045.

---

[1]. Whether Jackson invoked his right to counsel and whether he thereafter waived it are two distinct inquiries. Nothing said by a defendant in custody after he has invoked his right to counsel can be used to cast doubt on the effectiveness of the initial request for counsel. *Smith v. Illinois,* 469 U.S. 91, 100 (1984).

9

Following Jackson's invocation, Sgt. Benner stated "[w]ell I'm gonna book you into jail and then they will help you out with getting a lawyer," to which Jackson replies "Okay." Sgt Benner's very next words were, "If that's how you want to do it." Sgt. Benner's statement, "If that's how you want to do it", evinces a clear desire on his part to evoke a response from Jackson. This was not a 'necessary inquiry arising out of the incidents of the custodial relationship' but a statement calculated to initiate a further conversation with a defendant who has already invoked his right to counsel. *See Oregon*, 462 U.S. at 1045. Nothing in the conversation until then, had suggested to Jackson that there was any *other* way to do it. Clearly, Sgt. Benner's statement was designed to persuade Jackson to rethink his unequivocal request for counsel. Under this circumstance, Jackson did not himself initiate further conversation; Sgt. Benner did. Sgt. Benner failed to scrupulously honor Jackson's request for counsel, and instead, in violation of the rule in *Edwards,* sought to elicit a response from Defendant Jackson, as a result, Jackson's Fifth Amendment rights were violated during his April 25, 2017, interview. Any statement, admission, or answer given after Jackson invoked his right to counsel must be suppressed. The Court's inquiry, however, does not end there.

### 3. Evidence from Cellular Phone

The Court must determine whether the derivative evidence obtained as a result of Jackson's suppressed statement, specifically the evidence obtained from Jackson's cellular phone, must also be suppressed. In *United States v. Patane*, 542 U.S. 630, 634 (2004), a three-justice plurality of the Supreme Court held that physical evidence discovered as a result of a suspect's voluntary statement was admissible at trial, despite the fact that the suspect's *Miranda* rights were violated. The Court reasoned that "[b]ecause the *Miranda* rule protects against violations of the Self-Incrimination Clause, which, in turn, is not implicated by the introduction at trial of physical evidence resulting

from voluntary statements," that the exclusionary rule does not apply to physical evidence resulting from the voluntary statement. *Id.* at 634–37. Two concurring justices agreed the physical evidence was admissible, but would not have reached two ancillary questions addressed by the plurality.

In the present case, as in *Patane*, the violation of Jackson's Fifth Amendment right is fully vindicated by the suppression of Jackson's statements following the invocation of his right to counsel. That Jackson, in that statement, gave the police the passcode to his cell phone, and with it access to the physical evidence on the phone, does not require the suppression of the evidence found on Defendant's phone. As the Court concludes below, officers had authorization, pursuant to the April 21, 2017, search warrant to seize "cellular telephones, and the numbers, photographs , and videos stored therein," found at the residence. *See* ECF No. 43, Ex. 1. While, Jackson's motion to suppress statements, admissions and answers must be granted to the extent it seeks to suppress any statements made by Jackson during the April 21, 2017, interview, to the extent it seeks to suppress evidence found in Jackson's cellular phone, it must be denied.

**B. Motion to Suppress Search and Seizure (ECF No. 22)**

Jackson also asks to suppress evidence seized pursuant to the Government's search warrants for his residence and his cellular phone. The two search warrants in question are: (1) a search warrant signed by the Honorable Magistrate Judge Tony N. Leung on April 21, 2017, authorizing the search of Jackson's residence, at 1092 142nd Lane Northwest, Andover, Minnesota; and (2) the search warrant signed by the Honorable Magistrate Judge Hildy Bowbeer on July 26, 2017, authorizing the search of Jackson's cellular phone. *See* ECF No. 43, Ex. 1 and 3.

"Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a search warrant. . . ." *United States v.*

*Alexander*, 574 F.3d 484, 490 (8th Cir. 2009) (quoting *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007)). "A warrant is supported by probable cause if there is a fair probability that contraband or evidence of a crime will be found in the place to be searched." *United States v. Reinholz*, 245 F.3d 765, 776 (8th Cir. 2001) (quotation omitted). Court's assess probable cause "from the view point of a reasonable prudent officer, acting in the circumstances of the particular case." *Id*. (internal citations omitted).   In the search warrant application for Jackson's residence, Agent Gulick recounted the series of events that led the Government to investigate Jackson. ECF No. 43, Ex. 1. Specifically, she noted that between May, 2016 and October, 2016, Jackson purchased eight firearms. *Id*. Of these eight firearms, three were recovered from other individuals. *Id*. One of Jackson's firearms was recovered from a member of the Tre Tre Crips criminal street gang, one from a member of the Stick Up Boys gang, and one during a traffic stop which later revealed that the gun had been used in two other shootings. *Id.* The application to search Jackson's residence also indicated that it is common for person who engage in straw purchases of firearms and ammunition to keep documents relating to the purchase of these items, and pictures and documents of their co-conspirators in their home and cellular phones. *Id.* Further, that during the officers' interview with Jackson on October 14, 2016, Jackson stated that five of his firearms were missing and that he kept the firearm in a bag in his car, which he parked in his driveway. *Id*. Viewed as a whole, the information submitted in the search warrant application was sufficient to establish probable cause that additional evidence of illicit activity would be found in Jackson's home and cellular phone. *U.S. v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009) (holding probable cause existed for a residential search warrant after drug paraphernalia was recovered from the scene of an accident and the affiant stated that drug manufacturers often keep evidence of the contraband in their homes).

Because the Court concludes that the search of Jackson's cellular phone was authorized by the April 21, 2017, search warrant, the Court does not address the validity of the July, 26, 2017, search warrant.

### III. RECOMMENDATION

Based upon the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Jackson's motion to suppress evidence obtained as a result of search and seizure (ECF No. 22) be **DENIED**.

2. Jackson's motion to suppress statements, admissions, and answers (ECF No. 23) be **GRANTED** in part, and **DENIED** in part as follows:

    a. Jackson's motion to suppress be **DENIED** with respect to any statements, admissions, and answers made during the October 14, 2017, interview;

    b. Jackson's motion to suppress be **GRANTED** with respect to any statement, admissions, and answers made after he invoked his right to counsel during the April 25, 2017, interview;

    c. Jackson's motion to suppress be **DENIED** to the extent it seeks to suppress any physical evidence (including from his cell phone) obtained as a result of statements, admissions, and answers made during the April 25, 2017, interview.

DATED: February 27, 2018                              *s/Franklin L. Noel*
                                                     FRANKLIN L. NOEL
                                                     United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **March 13, 2018**, written objections that specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.